All right, the next case before the court is Visual Memory v. NVIDIA Corp. 162254, an appeal from the District Court of the District of Delaware. Mr. Weinblatt, you want three minutes for rebuttal? Yes, please. Okay. Counsel, you ready? Yes, sir. All right. Yes, ma'am. You may begin. May it please the Court, Rich Weinblatt of St. Louis and Weinblatt on behalf of Appellant Visual Memory. The 740 patent claimed inventions improve computers as tools. They improve the functioning of computer memory systems, which improves computers' performance. And they do not touch using a generic computer as a tool to carry out a task. The District Court overgeneralized and oversimplified the claims when deciding NVIDIA's Rule 12b6 motion. My problem is that I look at Claim 1 and it's kind of hard to overgeneralize that claim. I mean, it's about as broad as you could possibly be. Now, I know you point to a lot of things in the written description that you think inform that claim, but tell me what you're actually claiming there. Okay. So Claim 1 is an improvement upon prior art memory systems because in Claim 1 there is a programmable operational characteristic that's defined by the computer based on the type of processor that determines what type of data, whether that be code or non-code, gets stored in the cache. And when you look at the specification, which criticizes prior art, in Column 2, beginning at line 39 and going through line 56, one of the problems with these prior art memory systems is they were designed for a specific processor or a family of processors. And when that memory system was installed in a computer that did not have the ideal processor for which it was made, design tradeoffs occurred and memory access time was reduced. So what Claim 1 allows is one memory system that can be installed with multiple processors where it uses the programmable operational characteristic to determine whether, for example, instructions, which would be code or operands, non-code, get stored in the cache. So just two questions. One is, is your position the preamble has weight and adds to the claim and should be interpreted and understood as part of the elements of the claim, right? Yes, Your Honor. Okay. And then do I understand you to be interpreting the language type of data to be code and non-code, or is it broader than that? Well, it's defined in Column 3, line 38 to 40. As used here in the term data, it refers to information that includes both code, data instructions, and non-code data. And elsewhere throughout the patent, it also says the same thing about instructions being code. So it's your position that Claim 1 should be understood when it says type of data to be code and non-code and that that's expressly defined in the specification? That is correct. Yes, Your Honor. So then as you look at Claims 6 and 8, which are very different from Claim 1, Claim 6 requires the memory system having a programmable operational characteristic defined through configuration by the computer based on the type of process to determine what type of data, again, for example, code or non-code, is stored in the main memory and also requires open page bias. The specification explains that this increased system performance at Column 5, lines 22 to 30. Claim 8 requires a memory system that has a plurality of caches, three different programmable operational characteristics based on characteristics of the processor, which defines the requirements about two caches and the main memory system stored data. This, again, improved system performance and that improvement is also explained at Column 5, lines 6 to 8. This is the record evidence that's before the court. We have statements in the specification criticizing the prior art and throughout its description of the solution to the problem to be solved, there are statements about how the claimed solution improves upon the prior art. All of this was ignored by the district court. Is it your position that these claims are directed to something that's not abstract and therefore this would fall within the type of analysis done in ENFISH or is it your claim that there's something new and novel that's added and that we're talking about a Step 2? Well, we look at Step 1 of ALICE first. And ENFISH tells us that if the claims improve the functioning of a computer system itself, then it can be patent eligible. But ENFISH tells us how to do it. And I know you've been trying to explain to me how these claims, how to do it, but at least in Claim 1, all I see is that there's a programmable operational characteristic, but it doesn't tell us how to do that programmable work. Your Honor, both ENFISH and… Look, ENFISH has a specific algorithm in it that says, use this for the database and it will improve operations. I can point to and see in the specification and it limits it because it's a means plus function claim. This to me, and tell me how I'm getting this wrong, says here's this configuration of what I think is routine equipment, right? It's a computer, a bus, a cache, and stuff like that. You didn't invent any of that stuff. You program it in a certain way and that makes it function better. If you told me how you programmed it, that seems to bring it in to ENFISH, but I don't see how this tells me how you programmed it to come up with a better computer like ENFISH. Okay, so, Your Honor, Column 4, Lines 30 to 43, explains how the internal cache can be coded. The right buffer cache programmable operational characteristic as to whether it buffers data solely from a bus master other than a system processor is at Column 5, Lines 48 to 50. As for the main memory type of data, code or non-code, for which main memory 12 through controller 22 provides a bias, is also a programmable operational characteristic. What does that mean? I mean, here's the problem. I apologize in advance, but I read all of this. It's not a long patent or a specification. I read all of it. Those words are difficult. So you need to explain to me what that's telling me, how the computer is operating differently. Okay. So, Your Honor, the way it's operating differently is the programmable operational characteristic, when you look at the specification and the description, which sets forth the different examples, it's a feature that can be changed in response to the type or characteristic. No, no, no. I get that. I get that. That seems to me the gist of Claim 1. I'm sorry I used the word gist. I know that's controversial. The basis of Claim 1 is you have the system that instead of the old art, which is programmed in only one way and can't be changed, this is a more flexible system and can be programmed in different ways. But it doesn't tell me how. I mean, the idea that you can just program something in different ways, to me, seems relatively abstract. The CDL code that's attached to the patent sets forth an exemplary environment for how to do it. And it even says in the specification that CDL is a high-level hardware description language and Figure 2, this is in Column 6, it shows the structure and mode of operation of each of the modules defined through the CDL listing. But you're not agreeing to be bound by that code. I mean, that's why InFISH was successful. They limited their invention to a specific algorithm that was a concrete improvement over a database. McGrow tells us that DENIS claims are allowed. So if you look at the specification and the CDL code, that's providing the preferred embodiment that would teach one of ordinary skill in the art how to do it. Now, whether you're saying that the claim could be overbroad to a point that it's invalid based on prior art, that's for another day. That record's not before us. But as for whether it teaches one of ordinary skill in the art what a programmable operational characteristic is, we believe that it does. And there's no evidence suggesting otherwise. And where in the specification does it show that to me? Column 6, starting at line 1, going to line 16, is the first two paragraphs. Your Honors, NVIDIA does not challenge that there were problems with the prior art memory systems, as I previously explained. And NVIDIA also does not challenge that the claims seek to address this technological problem. Instead, they just stood before the court and the district court, and even in the report now that it says there's nothing inventive there. So I understand that the district court found that the abstract idea that your claims are drawn to is categorical data storage. So do you think that your claims directed to that abstract idea, or is it your position that it's directed to something where – what is the abstract idea? And even if that is the case, do you have a step two analysis where you can say, well, even if the claim is directed to categorical data storage, there's a technological improvement here? So first of all, we don't think that there's an abstract idea here. We don't understand how this is categorical data storage because it's actually one step removed from that. This is what's actually setting up the memory system for how it works. Now, if you're then going to ignore that like the district court did and say, okay, what's a memory system do? It's determining where code and non-code get – where it's sent. That's – maybe that is storing data and setting forth where, but you have to look at how is the memory system being programmed in order to do that. And that's what the court ignored when deciding the motion to dismiss. I see you have an inquisitive look. Basically, what I'm saying here is the district court ignored how the multiple processors. So for that reason, we don't think it's ever – It's not just categorical data storage. Your system instead is directed to the idea of having a processor. Based on the different type of processor, it will dictate how the memory operates, including whether it's going to store code or non-code. Exactly. So it's not as simplistic as what the district court says. Now, turning to step two, yes, we also believe that there's an event of step here because even if you were to look at the district court's abstract idea of categorical data storage and then you look at the claims, there is – we don't think there's any way that these claims will encompass the idea of putting a book on a library shelf, as the district court said. We still don't understand that analogy when you look at all the different elements of the claims. Claim six and claim eight, in particular, have all these requirements as to what the program operational characteristics are. Can you go into specifics on claims six and eight and how it differs? So claim six has a programmable operational characteristic that determines the type of data stored in the main memory, and it also requires an open page bias. An open page bias is essentially when the memory calls code and then next it calls non-code, it will automatically put code back in the place where it previously found the non-code. So it makes the computer run more efficient that way. We still don't know how a librarian putting a book on a library shelf does that. The library analogy is too broad. Same thing with NVIDIA's analogy of attorneys put books at a close proximity to where they're sitting at their desk. It doesn't do open page bias. It doesn't have a programmable operational characteristic. Claim eight has a plurality of caches and the main memory having programmable operational characteristics. So that's even further removed and more involved than claim six, meaning further removed from the library analogy. You're into your rebuttal time. You want to say the rest of it? Yes, Your Honor. Thank you. Your Honor, very briefly, I threw my back out this weekend, so if you see me grimace, it's not the court's question, which we welcome. It might be. Let me briefly address the points that counsel made. He pointed to examples in column four and column five regarding the 386 and 486 processors, and in column six it says, nor is the invention limited to applications employing the 386 or 486. So that helps the claims not at all. He pointed to the CDL code, and I would respectfully submit if you can read it, and I have colleagues who can, that there are no algorithms in there and it merely describes data categories. But it also says that's a preferred environment. Isn't that a written description or an enablement problem and not really a 101 question? It seems to me we're collapsing all of these cases into 101 when they don't really belong there. You know, your question is an excellent one, Your Honor, but the reason it isn't is because the focus should be on the claims, of course, read in light of the specification. And what it says in column six is the CDL listing defines a preferred embodiment. So a preferred embodiment details can't help us if there's not sufficient detail in the claims themselves. Well, the claim would cover the preferred embodiment. Just because the claim may cover a preferred embodiment that lists details, that's very distinct from ENFISH, for example. The ENFISH gave us the how. What's missing from this patent is the how. The reason ENFISH provided... So you're saying that 101 now becomes a written description or enablement? No, Your Honor. No, Your Honor. What I'm saying is that because ENFISH interpreted the claim correctly as a 112.6 limitation, they then read in a four-step algorithm. If there was some basis here... But if our job is to say what is the claim directed to, then we're supposed to read the claim in light of the specification, right? Absolutely. But that's different than... But if there's an embodiment in the specification, and I can't read this either, but if there's an embodiment in the specification that actually is a new memory structure and it tells you how to create it, why isn't that ENFISH? The reason it's not, Your Honor, is because that's not what's being claimed. Instead, what we've got is a detailed CDL listing that, based on our understanding, doesn't have those, but regardless is disclaimed by the specification as providing any limitation. Well, we've got case after case after case that says we're not supposed to read a claim as excluding preferred embodiments. Well, that's true, Your Honor, but the analysis, the ALICE analysis here, requires us to go through those two steps and just because we have a claim that the computer operation is being improved, ALICE itself says that that's no basis to grant patent eligibility. So the fact... No, that's not what ALICE says. ALICE says if all you're doing is claiming a computer that will be programmed to do a certain thing, if what it's doing is abstract, an abstract idea, then that's not enough, but that's not what they're claiming here. It is what they're claiming here, Your Honor. What I understood and read ALICE to say is that it doesn't make patent eligible any patent which just purports to improve the functioning of a computer, and that's what we have here. Just because we have an... But ALICE is slightly different if you think about it in terms of it's a situation where you're saying, hey, in the past you had this particular business method and this is the way you would operate it, and now I'm going to take that, and it doesn't have to be a business method, but a concept, a technique, a method, and I'm going to throw it on a computer now and it's going to be faster. It's going to be... So ALICE wasn't looking at improving the computer. ALICE was looking at using a computer to improve the activity. I'm just suggesting that that's part of what's in ALICE as it says, even though ALICE was about a business method, it was computerized, that just because you claim it improves the computer doesn't make it patent eligible. Here, Your Honor, if you look at what's being claimed, what's being claimed is a prior art sequence of generic computer elements, no dispute about that, and then we have this programmable operational characteristic not really defined, but if you look at column 2, what it says is, in the past most computer systems have been designed on the basis of a particular type of host processor, and in fact, that's exactly what counsel says in their brief. In their brief they say, in the past, at page 15, most memory systems were designed for use with a specific microprocessor or perhaps a family. So the alleged invention is programmable operational characteristic. What it does is describe in the patent and in the brief as part of what was known. So then the question is, where is the potential arguable inventive step here? It's in the programmable operational characteristic, but tells us nothing on how to go about doing that. Can I ask you some questions about that? Of course. Okay. So the programmable operational characteristic,  makes it so the memory works one way or another based on the type of processor. So, and as I read the specification, it's saying that, you know, you're right. In the past, a particular memory might store particular data to work with a particular processor, but here they're gonna have a memory that can work with multiple different kinds of processors. And so the idea is that this programmable characteristic will indicate how the memory is supposed to work for a particular type of processor. Why isn't that improving either the memory or the computer system as a whole? Yeah, the reason, Your Honor, is because it's not telling us how to go about it. So, you know, again, it's like the Capital One case. We have an interactive interface, but there was no explanation of how to go about doing it. Do you think one of ordinary skill in the art doesn't know how to make go about doing it? Yes, Your Honor. But why isn't that, as Judge O'Malley would say, a 112 problem? Because we have to look to the claim to determine whether there's something here that's inventive that's being added. And if all that's being added is a black box functional step that doesn't go about describing the how, then we're in the same place as a variety of cases, including Dealertrack, which says you have to specify how the hardware is programmed to perform the step. But those cases, like Dealertrack, are all about an idea, as I said before. You've got an abstract idea, and all of a sudden you're gonna automate it on a computer. You've got an idea, and you're gonna say, but it doesn't change the way the computer operates. Your Honor, there's two ways to look at this. One is that what we're dealing with is merely categorical data storage. That's a broad idea. That's what the district court found. We believe that's correct. Can you explain that? Sure. I do have to say that I was a little perplexed by this concept of that it's like putting a book on the library shelf. Well, so what it's like, Your Honor, is it's saying they provide two categories of data, code, which is computer instructions, and both code and non-code, which means everything. And then there's the other description. I think you asked counsel whether the preamble was limited to a type of data. No argument about that below. That would be a claim construction issue. But regardless, the claims talk about also data that comes from the bus master and data that comes from everything. So we have two specific embodiments dealing with two types of data. And all it's saying, Your Honor, is we're gonna put one of those two categories in a place that's more convenient and will operate more efficiently. So while the court, for example, may have a book of the court's rules and it may have that on a bookshelf that's right behind its desk, it may have a variety of other cases further away. But that seems to be what ultimately will occur later. That's like saying I claim a more sophisticated school bus, but then I'm gonna say, but the abstract idea is to drive children from one location to another. No, Your Honor. This is saying on the front end that we're gonna put data in place A or place B. What are we going to do that based on? No, it doesn't say we're gonna put data in place A. It says we're gonna create a system that will allow data transfers through a precise type of mechanism and do it in a way that the processor was never capable of doing before. Well, Your Honor, I disagree. It's not telling us what the precise type of mechanism is. That's the distinction here with ENFISH. So what it's telling us is we're gonna create a system that puts data in place A or place B and that will be based on this undefined programmable operational characteristic. And I would like to briefly take issue with the discussion regarding Claim 8 and 6. We're happy to discuss that, but the court was pretty clear in Electric Power whether a meaningful argument was presented for distinctive significance and contract extraction talked about whether the patentee focused on defending the representative claim. Here we have 58 pages in two briefs with one page in the main brief and two paragraphs in the reply brief focused on the dependent claims. There's no argument that any additional conventional elements impart inventiveness and there's no arguments that the claims are different in any manner material to the 101 inquiry. There's just three sentences, for example, regarding Claim 8 that are repeated that merely say, well, Claim 8 has additional caches, nothing new or different about that. And then it says Claim 8 has three programmable operational characteristics. Again, those are just three undefined functional boxes that tell us we're going to store memory in one of two places based on the specification says whether it's more efficient. The claims don't even tell us that. And I don't believe that that's clear to one of skill and the art and I don't think that that provides any inventiveness. How was it argued below? Was there a representative claim or were the claims argued separately? Below, it was argued principally on a representative claim. That was the majority argument, but we also separately preserved and argued each of the claims separately. And if you look at the appendix at 16 to 17, you'll see the district court's description and going through those claims independently. What I would submit, Your Honor, is that hasn't been preserved on appeal and it certainly hasn't been argued separately. Regardless, I'm happy to talk about those independent claims in the three sentences that are provided as the basis. As I said, they're more specific in that they claim different memory systems. That's just those conventional memories, main memory, plurality, caches. There's a discussion of registers, which I would submit haven't become any more non-conventional since Benson evaluated registers in 1972. And then there's this fast page and first page technique that counsel referenced, which is nothing more than a pointer. Again, they're known techniques for pulling up the most recently accessed data. The whole key here, according to this patent, is how do you do that? And the way that the patent says you do that is based on the programmable operational characteristic. And as the court recognized, there's no description of how. There's no description, for example, of the rules that were set forth in the claims in McRow, which went through these detailed descriptions of the mathematical basis on which you're going to provide facial animations as opposed to the subjective basis that were used by individuals beforehand. And there's certainly no description of technology that's comparable to BASCOM. Here, the counsel doesn't even claim that we have non-conventional and non-generic arrangement of known conventional parts. All we have is a sequence of known conventional memory pieces. And then we're saying the system is going to allocate what type of data goes into which memory area based on a programmable operational characteristic. That characteristic wasn't construed. The patentee didn't propose or present any potential... But wasn't this decided... What was this decided? It was decided early in the case, right? I mean, did the court engage in claim construction? What the court did, Your Honor, is at the very start of the claim construction argument, Judge Andrews, the district court, asked three times, not once, not twice, three times whether there was any claim construction proposed for that term. Counsel... You said at the beginning of claim construction proceedings. No, I apologize. At the 101 argument. I apologize, Your Honor. I misspoke. Asked three times. And then, again, at the end of the argument, he literally said, look, in the hour that you've had to think about it, do you have anything that you want to propose for construing this claim? And counsel said, no. We just are saying that we're not sure what it means, but it may mean something, and the CDA may have some reference to it. I would submit that to the extent claim construction is relevant to a 101 analysis, it's the burden of the patentee to at least identify what the claim term is and to propose a construction that may make a difference in the eligibility analysis. But here, that wasn't done, and I don't think it would make a difference. Respectfully, the district court correctly applied the two-step analysis here. It determined the focus of the invention was retrieving and receiving and storing data by the category of data. He then found that the additional limitations in the claims didn't add anything innovative. They were generic computer components, cache, main memory, bus, processor, and some registers described in less detail than those found ineligible in Benson. They then described this programmable... Is it your position that any time you have conventional hardware in a computer system, if the improvement is in the nature of software, it's not eligible? No, it's not, Your Honor. That, I think, is much closer to the Enfish decision. My statement is that if your alleged improvement in the conventional use of conventional components is something software-related, then the claim has to somehow be limited to what that software is. And here, all we have is the programmable operational characteristic. Why is that limited? It says that it's... I'm just going to push back a little bit and see what you have to say. So the preamble says that there's a programmable operational characteristic that's going to depend on the type of processor and that it's going to impact the memory and the type of data that the memory stores. Why isn't that enough? Because what we would need after that are the sort of decisional rules, for example, that were set out in the claim in McRow. So any time it's functional, you have to have very specific, narrow... Even if it improves the computer, you have to have very specific, narrow instructions on how it's performed. Well, I guess what I would say, Your Honor, is you need something more than just bare functional descriptions. So you can't, as the court has already decided, take a software brain and just say the software brain is going to make this analysis and going to come up with the result that's most efficient or best. You need something more than what we have here and what we have is nothing. I would respectfully submit that the district court correctly applied the two-step analysis and the court should affirm it. Thank you. All right, you have 2 minutes and 20 seconds left. Do you think one of Ordinaries County Art would know, you know, with the knowledge of one of Ordinaries County Art, would understand how to implement the invention in Claim 1? Yes, Your Honor. This pattern was invented by people that worked at NCR Corporation, which is a big computer software company, and these inventors were one of Ordinaries Skill in the Art. They wrote the code that's in the... they wrote the CDL that was submitted to the patent office. The answer is yes, and if that's a question as to whether one of Ordinaries Skill in the Art would or would not, that's a fact question. That's not ripe at the 12B6 stage. When deciding a motion to dismiss for invalidity under 101. What's your response to the argument that if you really want to fall into EnFish, you have to put all the functional elements into the claim itself? EnFish and AmDocs both say you look at the written description when we're doing the claims, and that's what you can do here to find that the claims are... the claims are sufficiently described in the specifications that one of Ordinaries Skill in the Art could practice it. In other words, when you look at the claims... And is that that CDL language in column 6 you were referring to? It's the CDL language in column 6. It's also the description in... I believe it's column 4. Can you walk the column 4 through me again? Because I didn't understand that. So column 4, line 21, beginning with an important feature of the present invention is the separation of the functionality of each of the caches, and the selected definition of those functions based on the processor type. That explains how separating the functionality cache, in other words, where code and non-code get stored, is a benefit, and then... Why isn't that just saying, based on the processor type, we're going to do it differently? I don't fully understand your question. Well, throughout this, it seems to me that what you're saying is we have a flexible system, and based upon the processor used, we're going to program it differently to achieve the best results. It doesn't tell me what kind of things you're going to think about depending on the different type of system. And this sentence you just quoted me, this sounds exactly like the same thing. Later in the paragraph, it does. So, for example, in column 4, line 32, for a system employing a 386 or 386SX system processor, internal cache 16 holds only code data, whereas for a system employing a 486 processor, internal cache 16 holds both code and non-code data. So there's different statements like that throughout the specification based on the type of processor, whether it be a 386, 386SX, or 486, because those are three different types of processors that require different items for the memory system in order to function efficiently. Now, my colleague said that visual memory did not make the statement that the components operate in an unconventional manner. That's false. The reply brief at page 14 specifically says, quote, when... These limitations in the respective claims require that any, quote, generic components operate in an unconventional manner to achieve an improvement in computer functionality, end quote, citing MDOCS and BASCOM, and that's referring to claims 1, 6, and 8. What's your response to the claim construction question? Why didn't you ask the court to construe claim 1 to necessarily include the information in column 6? So we actually raised the same argument that we raised with Your Honors today. That's in the appendix at APPX 0451 is where it begins, where we pointed the district court to the elements of the specification, and then NVIDIA raised the CDL code, and we informed the court that that CDL code or the CDL listing was the best mode and was for enablement, but also would permit one of ordinary skill in the art to practice the invention. But you didn't say... You said it was more for enablement, not that the claims were limited to it. What did you say? We said it was best mode. You didn't say it was preferred embodiment? Best mode can be considered a preferred embodiment. Essentially the same thing? Right, just like if you look at what we said and what we said today, that would essentially be plain meaning to one of ordinary skill in the art. Okay. Not plain meaning based on what a non-ordinary person, non-ordinary person of skill in the art thinks it means. Okay, you're out of time. What about the contention that you haven't raised? I'm sorry. I just said he was out of time, but you can go. Oh, sorry. But you're not out of time. What about the argument that you didn't argue the claims separately and that you were just treating them all as rising and falling together? That's not true. Throughout the district court briefing, we did argue, just like we did here, that there are difference in claims. But is it true you only dedicated one or two sentences to it here? No, that's not true. We have sentences throughout the briefs. We also have different sections for each. In both the opening and reply, there's a section related to no representative claim, but also sprinkled throughout the arguments dealing with step one and step two are arguments that claims one, six, and eight are different. Okay. Your Honor, I'm out of time. I thank you for the little brief extension, and we ask that you reverse the district court. Thank you. Thank you.